# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF ARKANSAS
# PINE BLUFF DIVISION

PAULETTE JACKSON                                                                        PLAINTIFF

V.                                         NO. 5:09CV00365 JTR

MICHAEL J. ASTRUE,
Commissioner, Social
Security Administration                                                                 DEFENDANT

## MEMORANDUM AND ORDER

### I.  Introduction

Plaintiff, Paulette Jackson, has appealed the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claim for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). Both parties have filed Appeal Briefs (docket entries #15 and #16), and the issues are now joined and ready for disposition.

The Court's function on review is to determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole and whether it is based on legal error. *Long v. Chater,* 108 F.3d 185, 187 (8th Cir. 1997); *see also* 42 U.S.C. § 405(g). While "substantial evidence" is that which a reasonable mind

might accept as adequate to support a conclusion,[1] "substantial evidence on the record as a whole" requires a court to engage in a more scrutinizing analysis:

> "[O]ur review is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision; we also take into account whatever in the record fairly detracts from that decision." *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). Reversal is not warranted, however, "merely because substantial evidence would have supported an opposite decision." *Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir. 1995).

*Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005).

On November 14, 2007, Plaintiff filed applications for DIB and SSI, alleging disability since November 15, 2006. (Tr. 94-103). In her "Disability Report - Adult," she reported that her "hyper-thyroid," "knee problem," arthritis in pelvis," and ulcers were her disabling conditions. (Tr. 116). After Plaintiff's claim was denied at the initial and reconsideration levels, she requested a hearing before an Administrative Law Judge ("ALJ").

On February, 2009, the ALJ conducted an administrative hearing. (Tr. 23-62). Plaintiff, her mother, and a vocational expert ("VE") testified. At the time of the hearing, Plaintiff was 41-years old, and had completed high school. (Tr. 27, 32). She had past relevant working as a cashier, a sewing machine operator, an ammunition assembly laborer, and a frame trimmer. (Tr. 55).

---

[1] *Reynolds v. Chater*, 82 F.3d 254, 257 (8th Cir. 1996).

The ALJ considered Plaintiff's impairments by way of the familiar five-step sequential evaluation process. Step 1 involves a determination of whether the claimant is involved in substantial gainful activity ("SGA"). 20 C.F.R. § 404.1520(a)(4)(I) (2005), §416.920. If the claimant is, benefits are denied, regardless of medical condition, age, education, or work experience. *Id.*, § 404.1520(b), § 416.920.

Step 2 involves a determination, based solely on the medical evidence, of whether the claimant has a "severe" impairment, *i.e.*, an impairment or combination of impairments which significantly limits the claimant's ability to perform basic work activities. *Id.*, § 404.1520(4)(ii), § 416.920. If not, benefits are denied. *Id.*

Step 3 involves a determination, again based solely on the medical evidence, of whether the severe impairment(s) meets or equals a listed impairment which is presumed to be disabling. *Id.*, § 404.1520(a)(iii), § 416.920. If so, and the duration requirement is met, benefits are awarded. *Id.*

Step 4 involves a determination of whether the claimant has sufficient RFC, despite the impairment(s), to perform the physical and mental demands of past relevant work. *Id.*, § 404.1520(4)(iv), § 416.920. If so, benefits are denied. *Id.*

Step 5 involves a determination of whether the claimant is able to make an adjustment to other work, given claimant's age, education and work experience. *Id.*,

§ 404.1520(4)(v), § 416.920. If so, benefits are denied; if not, benefits are awarded. *Id.*

In his May 21, 2009 decision (Tr. 10-22), the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since November 15, 2006, the alleged onset date; (2) had severe impairments consisting of "Graves' disease with Graves' ophthalmopathy status post total thyroidectomy and a bilateral orbital decompression;" degenerative arthritis in both knees "post diagnostic and therapeutic arthroscopy of the left knee;" and obesity; (3) did not have an impairment or combination of impairments meeting a Listing; (4) had the RFC to perform light work, sitting 6 to 8 hours in an 8-hour workday, further limited by standing 1 hour at a time, "would need to alternate between sitting and standing at will; due to degenerative arthritic pain that is mild to moderate she can only perform occasional climbing, stooping, crouching, kneeling and crawling but no balancing; no working around unprotected heights; and due to problems with fine vision she would not be able to do anything involving driving;" (5) could not return to her past relevant work; but (6) could perform other work existing in substantial numbers in the national economy, with examples being a dispatcher and an information clerk.[2] (Tr. 12-22). Thus, the

---

[2]In an alternative Step 5 finding, which further restricted Plaintiff's exertional RFC to sedentary work, the ALJ found that Plaintiff could still perform other work existing in substantial numbers in the national economy, with examples being a rating

ALJ concluded that Plaintiff was not disabled.

On October 22, 2009, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, thereby making it the final decision of the Commissioner. (Tr. 1-3). Plaintiff then filed her Complaint appealing that decision to this Court. (Docket entry #2).

## II.  Analysis

In Plaintiff's Appeal Brief (docket entry #15), she argues that the ALJ erred: (1) in failing to consider the combined effects of her impairments; (2) in asking the VE a hypothetical question that did not include all of her impairments; (3) in discounting her credibility; (4) in failing to adequately develop the record; and (5) in assessing her RFC.

For the reasons discussed below, the Court concludes that Plaintiff's arguments attacking the ALJ's RFC assessment, development of the record, and hypothetical question have merit, insofar as they address her limitations in eyesight. Before addressing those arguments, however, the Court will review the pertinent testimony and medical evidence.

Plaintiff testified that she wore prescription glasses. (Tr. 29). She had problems driving due to double vision. (Tr. 30). She described regularly having

---

clerk or a table worker. (Tr. 21-22).

double vision, even after a surgery to correct her "eyes bulging out." (Tr. 32). Following the surgery, she could not close her left eye all the way when trying to sleep. (Tr. 32). She was using eye drops and an ointment to treat her eye condition. (Tr. 32).

In describing her problems with double vision, Plaintiff stated: "I mean, I'm looking at you [her lawyer] now and I'm actually seeing two." (Tr. 39). She testified that she was using eye drops or a gel every thirty to forty minutes. (Tr. 40).

On September 23, 2007, Plaintiff was admitted to UAMS with complaints of abdominal pain. (Tr. 242). She was discharged on October 1, 2007, with diagnoses of peptic ulcer disease and hyperthyroidism. (Tr. 331). On October 19, 2007, Dr. Monica Agarwal, a UAMS endocrinologist, diagnosed Plaintiff with "likely Graves' disease."[3] (Tr. 322).

On October 29, 2007, Plaintiff saw Dr. Joseph Chacko, a UAMS ophthalmologist, for complaints of double vision. (Tr. 335-42). He diagnosed, among other things, "TED [thyroid eye disease]," and "diplopia [double vision] in upgaze."[4]

---

[3]Graves' disease is an autoimmune disorder causing hyperthyroidism. *Merck Manual Online Medial Library*, § 12, ch. 152.

[4]Thyroid eye disease ("TED"), also known as Graves' ophthalmopathy, or Graves' orbitopathy, can cause proptosis [protusion of the eyeball] and diplopia [double vision] due to edema and lymphoid infiltration of the orbital tissues. *Merck Manual Online Medical Library*, § 9, ch. 98.

(Tr. 335).

On January 22, 2008, Plaintiff underwent a consultative physical examination from Dr. Atiya Waheed, a general practitioner. (Tr,. 197-203). Dr. Waheed noted that Plaintiff had "proptosis - bulging eyes" and "dryness." (Tr. 199). Her corrected vision was 20/30 right and 20/50 left. (Tr. 199). Dr. Waheed diagnosed hyperthyroidsim, degenerative arthritis in both knees, proptosis of both eyes, and musculoskeletal pain. (Tr. 203). Dr. Waheed did not assess Plaintiff to have any limitations. (Tr. 203).

On February 25, 2008, she returned to Dr. Chacko for a followup, complaining of double vision in her upgaze. (Tr. 237). He diagnosed: "Thyroid eye disease or Graves' ophthalmopathy OU [both eyes]. She has a decrease in her visual acuity OS [left eye] which is most likely related to a dry cornea with poor blink response. She has increased exophthalmos [bulging] OU [both eyes] with more lid retraction OU [both eyes]. She has significant stare OU [both eyes]. She still has 3mm lagophthalmos [inability to close the eyelid] OS [left eye]. On the bright side, she has no compressive optic neuropathy." (Tr. 237). Dr. Chacko noted the need for lubrication and forced blinking, and a possible referral to an otolaryngologist for decompression surgery. (Tr. 238). On April 29, 2008, Plaintiff returned to Dr. Chacko complaining of double vision and pain when looking up. (Tr. 354). He then

referred her to an otolaryngologist for decompression surgery. (Tr. 353).

On July 2, 2008, Plaintiff saw Dr. Brendan Stack, an otolaryngologist at UAMS, for a possible orbital decompression and a total thyroidectomy. (Tr. 376). On July 29, 2008, Plaintiff returned to Dr. Chacko complaining of double vision in the left eye when looking straight ahead. (Tr. 408).

On August 26, 2008, Dr. Stack performed a total thyroidectomy and a bilateral orbital decompression. (Tr. 668).

On October 6, 2008, Plaintiff complained to Dr. Chacko that she had double vision when staring at objects. (Tr. 595). He noted a "stable exam" and "[thyroid eye disease] s/p thyrodect./orb decompress." (Tr. 596). On December 8, 2008, Plaintiff returned to Dr. Chacko complaining of double vision that had worsened since October. (Tr. 601). He again noted thyroid eye disease with "improved upgaze," "discussed strategies" for diplopia, and scheduled her for a three-month follow-up. (Tr. 600-01).

On January 8, 2009, Plaintiff had a surgical follow-up with Dr. Stack, her otolaryngologist. (Tt. 607-08). In his eye exam, he noted "propotic diplopia on peripheral gaze in all directions" in both eyes. (Tr. 607). He diagnosed "pt with continued diplopia, pt to see optho for possible lateral decompression vs strabismus repair." (Tr. 607). On January 14, 2009, Dr. Agarwal telephoned Plaintiff for an

8

endocrinology follow-up and Plaintiff complained of "mild" double vision which had not completely resolved. (Tr. 619). Plaintiff also stated that she was "following with optho." (Tr. 619).

In overlapping arguments, Plaintiff contends that the ALJ's RFC, and the hypothetical question he asked the VE, failed to take into account her double vision from Graves's disease.[5] (Pltf's App. Brf. at 5-6). The Commissioner responds that the ALJ "properly excluded Plaintiff's claims of disabling double vision" from the hypothetical questions; citing: (1) the lack of restrictions from her treating physicians; and (2) the 2008 consultative examination from general practitioner Dr. Waheed. (Dft's App. Brf. at 13).

The ALJ found, at Step 2, that Plaintiff had "severe" "Graves' ophthalmopathy

---

[5]RFC is a medical question and "at least some" medical evidence must support the ALJ's RFC determination. *Wildman v. Astrue*, 596 F.3d 959, 969 (8th Cir. 2010) (*citing Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir.2001)). Accordingly, "the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace." *Id.* The ALJ bears "the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence." *Wildman v. Astrue*, 596 F.3d 959, 969 (8th Cir. 2010) (*quoting Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir.2000)).

"A vocational expert's testimony constitutes substantial evidence when it is based on a hypothetical that accounts for all of the claimant's proven impairments. The hypothetical need not frame the claimant's impairments in the specific diagnostic terms used in medical reports, but instead should capture the concrete consequences of those impairments." *Hulsey v. Astrue*, 622 F.3d 917, 922 (8th Cir. 2010) (internal quotations and citations omitted).

status post total thyroidectomy and a bilateral orbital decompression." (Tr. 12). In his narrative discussion of the medical evidence, he stated as follows:

> In regard to her eye surgery, the claimant initially indicated that the surgery had improved her vision and that her double vision had improved. At a follow up in December, 2008, she did complain of increased double vision, but the eye doctor made no adjustments to her treatment at that time and in talked [sic] with her endocrinologist in January, 2009 she only mentioned mild double vision.

(Tr. 20).

At the administrative hearing, the ALJ incorporated Plaintiff's RFC into a series of hypothetical questions:

> I make my findings in my hypotheticals and they're noted . . . .There are issues in this case is [sic] a history of Graves' disease, hyperthyroidism, in which she has bulging eyes and dry eyes, occasional double vision or blurred vision, problems with complete closure of the left eye at night causing her to use gel and ointments and some Dry Eye to moisture and put moisture in her eye. However, the vision is close to normal, 20/30. 20/40 with correction. At worse, 20/50 in the left eye . . . . Here are my restrictions in this case: . . . . There are some problems related to fine vision. Certainly she can walk. She can read regular print and she can make change, as she does now, but I would not have this individual working a job requiring driving or operating machinery, working on [a] forklift, cab or bus."

(Tr. 56-58).[6] The ALJ went on to ask the VE to assume exertional limitations with a "sit/stand option," both at the light and sedentary levels. The VE answered that

---

[6] With respect to the ALJ's limitation of "some problems with fine vision," which restricted Plaintiff from driving, it is unclear from the record if the ALJ was basing this on double vision, reduced visual acuity, or some other problem.

Plaintiff could perform the jobs of "dispatcher" and "information clerk," at the light level, and "rating clerk" and "table worker," at the sedentary level. (Tr. 58-60). On cross-examination, Plaintiff's counsel asked the VE: "With the jobs of the table worker, the ratings clerk, the info clerk and the dispatcher, would you have been able to perform those jobs if you had double vision?" (Tr. 61). The VE answered: "Double vision may effect their ability to perform the job." (Tr. 61). Counsel did not ask any follow-up questions.

The ALJ seemingly discounted any limitations from Plaintiff's double vision because, in her last visit to the ophthalmologist, in December of 2008, Dr. Chacko "made no adjustments to her treatment," and, in a January 2009 telephone conversation with her endocrinologist, Dr. Agarwal, "she only mentioned mild double vision." (Tr. 20). However, the ALJ's narrow view of the medical evidence relevant to Plaintiff's problems with double vision fails to account for or even acknowledge her January 8, 2009 follow-up with Dr. Stack, the UAMS otolaryngologist who performed her orbital decompression. In his eye examination, on follow-up, he diagnosed Plaintiff as having "propotic diplopia on peripheral gaze" in all directions, and referred her to an ophthalmologist for possible surgery, either a "lateral decompression" or a "strabismus repair." (Tr. 613).

In light of the opinion from Plaintiff' treating surgeon, less than two months

before the administrative hearing, that she still had diplopia, possibly requiring corrective surgery, the ALJ should have obtained an opinion from Dr. Chacko, Plaintiff's treating ophthalmologist, addressing the extent of her diplopia and whether in fact she required further surgery. This issue was underdeveloped, especially in light of the VE's vague assertion that double vision "may" affect a person's ability to perform the available jobs that he identified.

### III. Conclusion

Thus, the Court concludes that the medical record in this case fails to contain substantial evidence sufficient to support the ALJ's assessment of Plaintiff's RFC or his Step 5 determination that there are jobs in the national economy which Plaintiff is capable of performing. On remand, the ALJ should fully develop the record regarding the extent of Plaintiff's diplopia, whether she requires further corrective surgery, and ensure that he includes all credible impairments and limitations in his hypothetical question.

IT IS THEREFORE ORDERED THAT the Commissioner's decision is reversed and this matter is remanded to the Commissioner for further proceedings pursuant to "sentence four" of 42 U.S.C. § 405(g) and *Melkonyan v. Sullivan*, 501 U.S. 89 (1991).

DATED this 24th day of March, 2011.

_____
UNITED STATES MAGISTRATE JUDGE